## S00P0112. MORROW v. THE STATE.
### (532 SE2d 78)

CARLEY, Justice.

Scotty Garnell Morrow killed Barbara Ann Young and Tonya Rochelle Woods and he was convicted by a jury of malice murder, felony murder, aggravated assault, aggravated battery, cruelty to a child, burglary, and possession of a firearm during the commission of a felony. The jury recommended a death sentence after finding beyond a reasonable doubt the following aggravating circumstances: that the murder of Ms. Young was outrageously vile, horrible or inhuman in that it involved torture and depravity of mind; that the murder of Ms. Woods was outrageously and wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, and an aggravated battery to Ms. Woods before her death; that the murder of Ms. Woods was committed while the defendant was engaged in the commission of the murder of Ms. Young and the aggravated battery of LaToya Precal Horne; that the murder of Ms. Young was committed while the defendant was engaged in the commission of the aggravated battery of Ms. Horne; and that the murders of Ms. Young and Ms. Woods were committed while the defendant was engaged in the

commission of a burglary. OCGA § 17-10-30 (b) (2), (7). Morrow appeals.[1]

## *Pre-Trial Issues*

1. Morrow claims that Hispanics were underrepresented in the composition of the 1994 grand jury pool, and the 1999 traverse jury pool in violation of the Sixth Amendment, the Fourteenth Amendment, OCGA § 15-12-40, and the Unified Appeal Procedure. To prevail on a Sixth Amendment jury pool composition challenge, Morrow must show: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in jury pools is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U. S. 357, 364 (II) (99 SC 664, 58 LE2d 579) (1979); *Bowen v. Kemp*, 769 F2d 672, 684 (11th Cir. 1985). To prevail on a Fourteenth Amendment challenge to the composition of a jury pool, Morrow must show: (1) the group is one that is a recognizable, distinct class; (2) the degree of underrepresentation, by comparing the proportion of the group in the total population to the proportion called to serve as jurors over a significant period of time; and (3) a selection procedure that is susceptible of abuse or is not racially neutral which supports a presumption of discrimination raised by the statistics. *Castaneda v. Partida*, 430 U. S. 482, 494 (III) (97 SC 1272, 51 LE2d 498) (1977); *Bowen*, supra. Generally speaking with regard to the second prong of both tests, an absolute disparity between the percentage of a group in the population and its percentage in the jury pool of less than 5% is almost always constitutional; an absolute disparity between 5 and 10% is usually constitutional; and an absolute disparity of over 10% is probably unconstitutional. See *Cook v. State*,

---

[1] The crimes occurred on December 29, 1994. The grand jury indicted Morrow on March 6, 1995, for malice murder (two counts), felony murder (two counts), aggravated assault (six counts), aggravated battery, cruelty to a child, burglary, and possession of a firearm during the commission of a felony. The State filed its notice of intent to seek the death penalty on May 1, 1995. The trial was held June 7-29, 1999. The jury convicted Morrow on all counts on June 26, 1999, and recommended a death sentence on June 29, 1999. Because the jury did not specify on the jury form that it was recommending a death sentence for both murders, the trial court merged the malice murder conviction for the killing of Tonya Woods with the malice murder conviction for the killing of Barbara Ann Young and imposed a single death sentence. The felony murder convictions were vacated by operation of law. *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993). In addition to the death sentence, the trial court sentenced Morrow to consecutive sentences of twenty years for aggravated battery, twenty years for cruelty to a child, twenty years for burglary, and five years for possession of a firearm during the commission of a felony. The aggravated assault convictions merged with other convictions. Morrow filed a notice of appeal on July 21, 1999 and the case was docketed in this Court on October 4, 1999. The case was orally argued on January 18, 2000.

255 Ga. 565, 571 (11) (340 SE2d 843) (1986) ("As a general proposition, absolute disparities under 10% usually are sufficient to satisfy constitutional requirements."). A violation of OCGA § 15-12-40 is proven by showing a wide absolute disparity between the percentage of the group in the population and its percentage in the jury pool. *West v. State*, 252 Ga. 156, 157 (1) (313 SE2d 67) (1984) (17% absolute disparity for females in jury pool from females in county population violates OCGA § 15-12-40); *Devier v. State*, 250 Ga. 652 (1) (300 SE2d 490) (1983) (36% absolute disparity for females in jury pool violates statute). The Unified Appeal Procedure states that there should be no imbalances for cognizable groups greater than 5%, UAP § E, but this Court has stated that the 5% rule is a prophylactic rule designed to ensure "to the extent possible that disparities would be kept well below the constitutional minimum." *Parks v. State*, 254 Ga. 403 (6), 408, fn. 4 (330 SE2d 686) (1985).

The defendant has the burden of proving a prima facie case of constitutional error in the composition of the jury pool. *Berryhill v. Zant*, 858 F2d 633, 638 (11th Cir. 1988); *Machetti v. Linahan*, 679 F2d 236, 241, fn. 6 (11th Cir. 1982) (the standard for proving a prima facie jury pool composition violation is virtually identical under the Sixth and Fourteenth Amendment tests). With regard to the second prong of the Sixth and Fourteenth Amendment tests, the extent and effect of any alleged underrepresentation is a mixed question of fact and law. *Berryhill*, supra at 638, fn. 8. The degree of underrepresentation is a question of fact to be determined by the trial court sitting as factfinder. *Berryhill*, supra; *United States v. Esle*, 743 F2d 1465, 1472, fn. 12 (11th Cir. 1984). The sufficiency of the disparity, once its extent has been determined, to show a constitutional violation is a question of law. *Berryhill*, supra; *Esle*, supra. With mixed questions of fact and law, this Court accepts the trial court's findings on disputed facts and witness credibility unless clearly erroneous, but independently applies the legal principles to the facts. *Linares v. State*, 266 Ga. 812, 813 (2) (471 SE2d 208) (1996).

Morrow claimed that the official 1990 Census was not reliable in determining the percentage of Hispanics in Hall County in 1994 and 1999 because there had been a large influx of Hispanics into the county since 1990 and a significant undercount of Hispanics during the 1990 Census. Instead of using the 1990 Census, Morrow presented an expert who had conducted a test census in 1996 of the Census block in Hall County that had reported the highest number of Hispanics in 1990. Overall, there are 86 Census blocks in the county. Respondents in the door-to-door survey of the 359 households in that Census block were told that no names were needed and that the survey responses would be shared with the Hispanic community to benefit the entire community. Morrow's expert then determined that,

based on the test census and published estimates like the Georgia County Guide, there were approximately 2.5 times the number of Hispanics in Hall County than reported in the 1990 Census. She estimated that Hispanics who were over 18 and, therefore, jury-eligible, comprised 14.1% of the total jury-eligible Hall County population and, when compared with the .8% of Hispanics she found on the grand jury list, this amounted to an absolute disparity of 13.3%. She also used the 1996 test census and similar documentary sources to estimate that the absolute disparity for Hispanics was 12.7% when comparing the 1999 traverse jury list with the total jury-eligible Hispanic population.

Although the trial court found persuasive evidence that Hall County Hispanics were a cognizable group, the trial court found that the second prong of the Sixth and Fourteenth Amendment tests was not met because Morrow's expert's estimate that jury-eligible Hispanics comprised approximately 2.5 times their numbers reported for Hall County in the 1990 Census was unreliable. The trial court was critical of the expert's test census because the respondents were told that the survey was intended to benefit the Hispanic community and this may have affected the responses. See *Esle*, supra at 1474-1475 (Dade Latin Market Survey used by defendant to estimate the number of Latinos in Dade County, Florida, was found to be unreliable because the survey was created by Spanish language radio stations to recruit sponsors and they therefore had an incentive to inflate the numbers). The trial court also noted that it was conducted in a 1/86th section of the county picked specifically for having the highest number of Hispanics with the results extrapolated to the entire county. The State also pointed out several errors Morrow's expert made in her supporting data and that she had assumed a constant growth rate for the entire county population. Accordingly, the trial court refused to adopt Morrow's expert's Hispanic population percentage instead of the official 1990 Census statistics and we find that this decision was not clearly erroneous. See *Linares*, supra; *Esle*, supra (the trial court is not required to accept the defendant's figures if unreliable, even if unrebutted by the government); *Reynolds v. State*, 200 Ga. App. 43, 44 (2) (406 SE2d 553) (1991) (the weight to be given expert testimony, like that of any other witness, is to be determined by the trier of fact, and the trier of fact is not bound by expert testimony). See also UAP § E (jury certificate population numbers to be drawn from the "most recent decennial census"). It was not unreasonable for the trial court to refuse to credit Morrow's expert's Hispanic population estimates when Morrow's test census was based on a 1/86 section of the county picked for its high number of Hispanics and extrapolated to the county as a whole. It was also reasonable for the trial court to note that the 1990 Census was a federally-funded

county-wide head count conducted by the U. S. Census Bureau with help from local Hispanics, including one of Morrow's Hispanic witnesses. Morrow attacks the ethnic percentages shown by the 1990 Census as being unreliable, but the 1990 Census was clearly more comprehensive than the 1996 survey of a single Census block. Since the trial court found Morrow's overall Hispanic population statistics to be unreliable, we need not address whether his jury-eligible population numbers are affected by evidence that less than half of Hall County Hispanics have U. S. citizenship, which is a requirement for jury service. OCGA § 15-12-40.1; *Esle*, supra at 1474.

When the 1990 Census numbers for Hispanics in Hall County are compared with the percentage of Hispanics on the jury lists, the absolute disparities are within the legal limit. The 1990 Census reported that there were 3,252 Hispanics over the age of 18 in Hall County out of a total jury-eligible population of 70,969, approximately 4.6% of the total. Morrow's expert examined the 1994 grand jury list and determined that .8% of the people on the list were Hispanic. The resulting absolute disparity of 3.8% is not a violation of law. See *Cochran v. State*, 256 Ga. 113, 115 (8) (344 SE2d 402) (1986) (6% absolute disparity of blacks and 7.1% absolute disparity of women on grand jury list not a violation of OCGA § 15-12-40); *Cook*, supra at 571 (11) (general rule is that absolute disparities under 10% are not unconstitutional); *Parks*, supra at 408 (4) (a) and fn. 4; *United States v. Rodriguez*, 776 F2d 1509, 1511-1512 (11th Cir. 1985) (absolute disparities of 6.6% for blacks and 5.5% for Hispanics not unconstitutional); UAP § E (disparity should be less than 5%). Morrow's expert estimated that 1.6% of the people on the 1999 traverse jury list were Hispanic and, when compared with the 1990 Census statistics, this results in an absolute disparity of 3%, well within the legal limit. The trial court did not err by ruling that the composition of the grand and traverse jury pools did not violate the Constitution, OCGA § 15-12-40 and the Unified Appeal Procedure.

2. The trial court ordered a change of venue, but later decided that venue would remain in Hall County. There already had been an evidentiary hearing on the composition of the Hall County grand jury pool with regard to the representation of Hispanics. For that hearing, Morrow had received funds for his expert to analyze the grand jury list to determine the number of Hispanics on the list. Because there is no separate category for Hispanics on the list, the expert needed to obtain and analyze information such as maiden name and place of birth for each person. After the trial court ruled that venue would remain in Hall County, Morrow filed a challenge to the composition of the traverse jury pool and moved for funds so that his expert could analyze the traverse jury list to determine the number of Hispanics in that pool. The trial court denied the motion for funds to conduct

this analysis and Morrow claims that this ruling was error. However, the record shows that much of the evidence that Morrow claimed he needed with regard to the traverse jury pool was similar to the evidence he had used, and the trial court had found unconvincing, in support of his motion concerning the grand jury pool. His brief and the expert's affidavit in support of the motion for additional funds mainly recounted the evidence presented during the challenge to the grand jury pool. We will uphold a trial court's ruling on an indigent defendant's request for funds for expert assistance absent an abuse of discretion and Morrow failed to show why these additional funds were critical to his defense. *Thomason v. State*, 268 Ga. 298, 310 (7) (486 SE2d 861) (1997); *Crawford v. State*, 267 Ga. 881, 883 (2) (485 SE2d 461) (1997). Accordingly, we find no error.

3. Morrow's arrest was not illegal. Morrow drove back to his home in Barrow County after the shooting. The police in Hall County informed the Barrow County police that there had been a shooting homicide and that Morrow was the suspect because survivors had identified Morrow as the shooter. They also provided a description of the pickup truck that Morrow had been driving. The Barrow County police noticed the truck in Morrow's driveway and an investigator called the house and spoke with Morrow's sister, who was a sheriff's deputy. She and Morrow agreed to leave the house and speak with the police in their driveway. They met the police there and Morrow was taken into custody. This warrantless arrest was not improper. *Mincey v. State*, 251 Ga. 255, 260 (6) (304 SE2d 882) (1983). There was sufficient probable cause for this arrest and for the arrest warrant that was issued in Hall County at approximately the same time. *Mincey*, supra; *Goodman v. State*, 255 Ga. 226, 229 (13) (336 SE2d 757) (1985) (probable cause may rest upon the collective knowledge of the police).

In addition, the evidence shows that Morrow's subsequent videotaped statement to the police was voluntary and admissible. Morrow was 27 years old and had a 10th grade education. He was in police custody only a short time before the statement. His handcuffs were removed, he read and signed a *Miranda* rights waiver form and he initialed each enumerated right as it was read to him. He was alert, not intoxicated, and appeared to understand all that was said. He was not threatened, coerced or promised anything. He agreed to speak with the police and he did not request an attorney. Thus, the trial court did not err in denying the motion to suppress Morrow's statement. *Lee v. State*, 270 Ga. 798, 800 (2) (514 SE2d 1) (1999).

4. Morrow complains that the consent for the warrantless search of Morrow's house, truck and curtilage was not voluntary. After reviewing the record, we conclude that the trial court properly ruled that both Morrow and his mother voluntarily consented to the search

of the property. Morrow gave his consent to search during his videotaped statement. In addition to the factors showing voluntariness set forth in Division 3, the police read the consent to search form to Morrow, which listed the property to be searched and included the caveat that he did not have to give consent, and Morrow willingly signed it. *Schneckloth v. Bustamonte*, 412 U. S. 218, 226 (II) (A) (93 SC 2041, 36 LE2d 854) (1973); *Raulerson v. State*, 268 Ga. 623, 625 (2) (a) (491 SE2d 791) (1997); *Thomason v. State*, supra at 302 (2) (b). The evidence also supported the trial court's finding that Morrow's mother, who owned the house where Morrow was living and the truck he was using, read and voluntarily signed consent to search forms for the property. There is no error.

5. Morrow claims that venue should have been changed from Hall County.

(a) In 1995, Morrow moved for a change of venue and the State consented to the grant of that motion. No evidentiary hearing was held on whether the trial setting was inherently prejudicial due to pretrial publicity because the trial court granted the motion based upon the parties' consent. In its order, the trial court directed that the parties either agree on or that they separately provide a recommendation of a transfer county for the selection of the jurors, with the trial to be conducted in Hall County. See OCGA § 17-7-150 (a) (3). There is no record of either party recommending transfer counties and no transfer county was ever designated by the trial court. In 1998, the State revoked its consent and moved for an evidentiary hearing on whether venue should remain in Hall County due to the paucity of media coverage in the three-plus years since the crimes were committed. The trial court initially denied this motion, but then it reconsidered and ordered an evidentiary hearing on whether Hall County was inherently prejudicial due to pretrial publicity. After the evidentiary hearing, the trial court ruled that venue would remain in Hall County. Morrow claims that the trial court erred by ordering the evidentiary hearing and later ordering that venue would remain in Hall County after it granted the motion to change venue in 1995. See *Johnston v. State*, 118 Ga. 310 (45 SE 381) (1903). However, the granting of Morrow's motion for a change of venue had been based solely on the consent of the parties and there had not been a finding by the trial court that an impartial jury could not be obtained in Hall County. See OCGA § 17-7-150 (a) (1); *Johnston*, supra. Moreover, no transfer county had ever been designated by the trial court. We conclude that the trial court did not err by ordering an evidentiary hearing on whether an impartial jury could be obtained in Hall County, and that it had the discretion to order that venue remain in Hall County.

(b) To justify a change of venue, the defendant must show that

the trial setting was inherently prejudicial as a result of pretrial publicity or that a sufficient number of jurors were actually biased against the defendant. *Barnes v. State*, 269 Ga. 345, 347 (2) (496 SE2d 674) (1998); *Jones v. State*, 267 Ga. 592, 594 (1) (a) (481 SE2d 821) (1997). In order to determine whether a trial setting was inherently prejudicial, we consider the nature and extent of media coverage, especially if any coverage was inflammatory or inaccurate, and the time interval between the publicity and the trial. *Barnes*, supra; *Cargill v. State*, 255 Ga. 616, 627 (10) (340 SE2d 891) (1986). In this case, the news coverage was not extensive or inflammatory and most of the news coverage occurred around the time of the crimes, which was over four years before the trial. The trial setting was not inherently prejudicial. With regard to the bias of individual jurors due to media exposure, Morrow failed to show that a high percentage of jurors had formed opinions about the case or that there was a relatively high excusal rate due to exposure to pretrial publicity. See *Barnes*, supra; *Jones*, supra. The trial court did not abuse its discretion by refusing to change venue in this case.

### *Jury Selection*

6. The trial court did not err by excusing prospective juror Wilkerson for cause because his views on the death penalty " 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997), quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985). Despite some equivocation, juror Wilkerson stated that he could never vote for the death penalty, even in the worst case he could imagine. See *Greene*, supra at 48-50. The trial court did not err by excusing several other jurors for bias against the death penalty. *Greene*, supra. The trial court also did not improperly restrict voir dire. The scope of voir dire generally is left to the trial court's discretion and the extensive voir dire in this case was sufficient to ascertain any bias held by the prospective jurors. *Barnes*, supra at 351-352 (10).

7. The trial court did not err by refusing to excuse for cause prospective jurors O'Kelley, Hoynes, Callahan, Taylor, and Gibson. Although prospective jurors O'Kelley, Hoynes, Callahan, and Taylor were leaning toward imposing a death sentence, the transcript shows that they could vote to impose all three sentencing options. *Mize v. State*, 269 Ga. 646, 652 (6) (d) (501 SE2d 219) (1998) (a prospective juror is not disqualified merely for leaning for or against a death sentence); *Greene*, supra. Prospective juror O'Kelley had also been a sorority sister of the district attorney 20 years ago while in college, but she has had only limited contact with her since that time. Juror

O'Kelley said that this relationship would not affect her and that she could set everything aside and decide the case only on the merits. She was properly qualified to serve. See *Irvin v. Dowd*, 366 U. S. 717, 723 (81 SC 1639, 6 LE2d 751) (1961); *Mize*, supra at 651-652 (6) (a) (whether to strike a juror lies within the sound discretion of the trial court). Prospective juror Hoynes, whose mother had been the victim of domestic abuse, and prospective juror Gibson, who worked for an accountant who had served as the district attorney's campaign manager, could also set aside any possible bias when deciding the case. They were qualified to serve. *Mize*, supra; *Cromartie v. State*, 270 Ga. 780, 783 (9) (c) (514 SE2d 205) (1999).

### *The Guilt-Innocence Phase of Trial*

8. The evidence presented at trial authorized the jury to find the following: Barbara Ann Young began dating Scotty Morrow in June 1994 and she broke up with him in December 1994 because of his abusive behavior. At 9:52 a.m. on December 29, 1994, Morrow telephoned Ms. Young at her home, but she told him that she wanted him to leave her alone. After hanging up, Morrow drove to Ms. Young's home and entered without permission. Ms. Young was in the kitchen with two of her friends, Tonya Woods and LaToya Horne. Two of Ms. Young's children, five-year-old Christopher and eight-month-old Devonte, were also present. There was an argument in the kitchen and Ms. Woods told Morrow to leave because Ms. Young did not want to have anything to do with him anymore. Morrow yelled, "Shut your mouth, bitch!" and pulled a nine-millimeter pistol from his waistband. He shot Ms. Woods in the abdomen and Ms. Horne in the arm. The bullet that struck Ms. Woods severed her spinal cord, paralyzing her from the waist down.

Ms. Young fled down the hallway and into her bedroom. Morrow caught her in the bedroom and beat her on the head and face. She managed to flee back to the hallway where Morrow grabbed her by the hair and shot her point-blank in the head, killing her. From his hiding place in a nearby bedroom, Christopher saw Morrow kill his mother. Morrow returned to the kitchen. Testimony as to clicking noises and the fact that a live cartridge was found on the kitchen floor indicate that he either reloaded his pistol or cleared a jam. He then placed the muzzle of the pistol an inch from Ms. Woods' chin and killed her with a shot to the head. The medical examiner opined that, although she was paralyzed, Ms. Woods had not lost much blood at that time and was probably still conscious when the fatal shot was fired. Morrow also shot Ms. Horne two more times, in the face and the arm, and fled after cutting the telephone line.

Despite her injuries, which included a shattered palate, perma-

nent deafness in one ear, and nerve damage in an arm, Ms. Horne managed to get to her feet and run to a neighbor's house. She and Christopher told the responding police officers that Morrow was the shooter. Morrow confessed after his arrest and the murder weapon was found hidden in his backyard. At trial, Morrow admitted that he shot the victims because he "wanted [Ms. Woods] to shut up."

The evidence was sufficient to enable a rational trier of fact to find proof of Morrow's guilt of two counts of malice murder, two counts of felony murder, six counts of aggravated assault, aggravated battery, cruelty to a child, burglary, and possession of a firearm during the commission of a felony beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

9. Morrow claims that the trial court erred by permitting evidence of three incidents as prior difficulties. See *Wall v. State*, 269 Ga. 506, 509 (2) (500 SE2d 904) (1998). He asserts that testimony concerning Ms. Young's statements to others about Morrow's violent acts and threats, was inadmissible hearsay which was erroneously introduced under the necessity exception to the hearsay rule. To satisfy the necessity exception to the hearsay rule, the proponent must show a necessity for the evidence and a circumstantial guaranty of the statement's trustworthiness. *Perkins v. State*, 269 Ga. 791, 795 (4) (505 SE2d 16) (1998); *McKissick v. State*, 263 Ga. 188, 189 (3) (429 SE2d 655) (1993). The necessity for the use of the hearsay in this case was shown by Ms. Young being unavailable to testify due to her death. Her statements to others about the prior difficulties were relevant to establish motive, intent, and bent of mind resulting from Morrow's relationship with her. Her statements about violence and threats in the relationship were more probative than other evidence about the prior difficulties. *Clark v. State*, 271 Ga. 6, 9 (5) (515 SE2d 155) (1999) (establishing elements necessary to show first prong of necessity exception); *Wall*, supra (explaining rationale for admission of prior difficulties). The circumstantial guaranty of trustworthiness is shown by the following evidence regarding the prior difficulties:

(a) *December 6, 1994.* The State introduced evidence that Morrow hit Barbara Ann Young on this date and blackened her eye. One witness testified that Ms. Young told her that Morrow had threatened her, but she did not observe any injuries to Ms. Young. Three witnesses testified that Ms. Young told them Morrow had hit her and they observed that she had a swollen or black eye as if she had been struck. There was a short time between the incident and the statements to her friends and teachers; she never recanted or disavowed the statements; and her eye injury corroborated the substance of the statements. See *Perkins*, supra; *McKissick*, supra; *Luallen v. State*, 266 Ga. 174, 178 (5) (465 SE2d 672) (1996). In addition, a fifth witness testified for the State that she personally saw Morrow

hit Ms. Young on December 6. The trial court did not err by admitting hearsay regarding this prior difficulty.

(b) *December 9, 1994.* The State presented evidence that Morrow picked up Ms. Young to drive her to her classes at Lanier Tech, but instead drove her to another county against her will, hit her, and forced her to have sex with him. Several State witnesses, including friends, teachers, and police officers to whom she reported the incident, testified that Ms. Young told them what had happened shortly after the incident. In fact, an instructor at Lanier Tech testified that Ms. Young called her from a pay phone during the incident when Morrow was stopped at a convenience store. She testified that Ms. Young was hysterical and said, "help me, call the police, he's got me." She identified Morrow as her abductor. Although Morrow claims that the statements were unreliable because no arrest warrant ever issued over this incident, Ms. Young never recanted her statements and several witnesses also testified that they observed knots or bumps on her head. The trial court did not err by admitting this evidence. See *Perkins*, supra; *Luallen*, supra; *McKissick*, supra. Further, there was testimony that Ms. Young did not seek a warrant because she was assured by Morrow's family that he would stay away from her. At trial, Morrow admitted that he took Ms. Young to another county against her will on December 9, but claimed that the sex was consensual.

(c) *December 24, 1994.* A friend of Ms. Young, who lived in the apartment below Ms. Young's apartment, testified that during a Christmas party Ms. Young came running to her apartment yelling, "He (Morrow) gonna kill me, he got a gun." The neighbor testified that Ms. Young was very afraid. She heard Morrow telling Ms. Young through the door that he was not going to bother her and that she could go back upstairs. The next day, Ms. Young told the neighbor that Morrow might have had a knife and not a gun, but she never recanted that he had threatened her. Although the neighbor did not see Morrow or a gun, the statement's veracity is further corroborated by Morrow's statement to the police on December 29, in which he admitted that he had a heated argument with Ms. Young on Christmas Eve and that he grabbed her by the shirt. LaToya Horne also testified that she saw Morrow hit Ms. Young at the Christmas party because he was upset that some men wanted to play cards with her. We conclude that there was sufficient circumstantial evidence of trustworthiness regarding Ms. Young's statement to her neighbor, and that the trial court did not err by admitting it. See *Perkins*, supra; *McKissick*, supra. We further note that Morrow testified at trial that he routinely carried a loaded pistol in his truck or on his person.

10. Ms. Horne testified that Ms. Young received a telephone call

from Morrow on the morning of the murders, and that Ms. Young told Morrow to leave her alone. However, Ms. Horne did not listen on the line and she never heard the caller's voice. Ms. Young also never identified the caller as Morrow to Ms. Horne. Ms. Horne was allowed over defense objection to give her "opinion" that the caller was Morrow based on the content of Ms. Young's comments during the telephone conversation. This was error. The substance of a telephone conversation is not admissible unless the caller can be identified and an identification is not sufficient if it rests solely on the contents of the conversation. *Brown v. State*, 266 Ga. 723, 725 (3) (470 SE2d 652) (1996). The error, however, was harmless. The State introduced telephone records that showed a nine-minute telephone call was placed from Morrow's house to Ms. Young's home at 9:52 a.m., and Morrow admitted at trial that he was the person who made this telephone call.

11. OCGA § 16-5-70, the cruelty to children statute, is not void for vagueness. *Davis v. State*, 234 Ga. 730, 733 (6) (218 SE2d 20) (1975). The trial court did not need to define "maliciously" for the jury when charging them on this offense. *Jones v. State*, 263 Ga. 835, 837 (2) (439 SE2d 645) (1994).

12. The evidence was sufficient to show that Morrow did not have authority to enter Ms. Young's home on December 29, 1994. *Jackson v. Virginia*, supra. Accordingly, the trial court correctly declined to direct a verdict of acquittal on the burglary charge. OCGA § 17-9-1 (a); *Raulerson*, supra at 625 (1).

13. Viewed in the light most favorable to the prosecution, the evidence was sufficient for the jury to find Morrow guilty of cruelty to a child for killing Christopher's mother in the child's presence. *Jackson v. Virginia*, supra. See also *Hall v. State*, 261 Ga. 778, 782 (7) (b) (415 SE2d 158) (1991); *Turney v. State*, 235 Ga. App. 431, 434 (2) (509 SE2d 670) (1998). Morrow admitted at trial that he knew Christopher was present in the home before he began killing the victims. Christopher testified that he saw Morrow enter the apartment. When the shooting erupted in the kitchen, he grabbed his baby brother and tried to hide with him in a closet in their bedroom. Christopher peeked into the hallway and saw Morrow seize his mother by the hair and shoot her in the head. The trial court properly denied Morrow's motion for a directed verdict of acquittal on this charge. *Raulerson*, supra.

### The Sentencing Phase of Trial

14. The evidence was sufficient to authorize the jury to find beyond a reasonable doubt the statutory aggravating circumstances which supported his death sentence. *Jackson v. Virginia*, supra;

OCGA § 17-10-35 (c) (2).

15. OCGA § 17-10-30 is not unconstitutional. *Cromartie*, supra at 783 (6).

16. Execution by electrocution is not unconstitutional. *DeYoung v. State*, 268 Ga. 780, 786 (6) (493 SE2d 157) (1997).

17. Morrow's death sentence was not imposed as the result of passion, prejudice or any other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence is also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of the death penalty in this case, in that all involve the deliberate, unprovoked murder of two or more people, an intentional murder committed during a burglary, or a murder involving the OCGA § 17-10-30 (b) (7) aggravating circumstance.

*Judgments affirmed. All the Justices concur, except Sears, J., who concurs in part and dissents in part.*

APPENDIX.

*Gulley v. State*, 271 Ga. 337 (519 SE2d 655) (1999); *Palmer v. State*, 271 Ga. 234 (517 SE2d 502) (1999); *Cook v. State*, 270 Ga. 820 (514 SE2d 657) (1999); *Jenkins v. State*, 269 Ga. 282 (498 SE2d 502) (1998); *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997); *McMichen v. State*, 265 Ga. 598 (458 SE2d 833) (1995); *Tharpe v. State*, 262 Ga. 110 (416 SE2d 78) (1992); *Lynd v. State*, 262 Ga. 58 (414 SE2d 5) (1992); *Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987); *Childs v. State*, 257 Ga. 243 (357 SE2d 48) (1987); *Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986).

SEARS, Justice, concurring in part and dissenting in part.

I concur in the majority's affirmance of appellant's adjudication of guilt. However, due to the concerns I expressed in my partial dissent to *Wilson v. State*,[2] I dissent to Division 17 of the majority opinion, and to the affirmance of the death penalty as it requires death by electrocution.

DECIDED JUNE 12, 2000 —
RECONSIDERATION DENIED JULY 28, 2000.

*William M. Brownell, Jr., Harold M. Walker, Jr.,* for appellant.

---

[2] 271 Ga. 811 (525 SE2d 339) (1999).

*Lydia J. Sartain, District Attorney, Lee Darragh, Lisa A. Jones, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Karen N. Anderson, Assistant Attorney General,* for appellee.