S11A0937, S11X0938. HUMPHREY v. MORROW; and vice versa.
(717 SE2d 168)

THOMPSON, Justice.

A jury convicted Scotty Garnell Morrow of the murders of Barbara Ann Young and Tonya Rochelle Woods, of the aggravated battery of LaToya Horne, and of related crimes. The crimes all occurred on December 29, 1994. Morrow was sentenced to death and to several terms of imprisonment, and this Court affirmed his convictions and sentences on June 12, 2000. *Morrow v. State*, 272 Ga. 691 (532 SE2d 78) (2000). Morrow filed a petition for a writ of habeas corpus on October 30, 2001, which he amended on February 3, 2005. An evidentiary hearing was held on April 25 and 26, 2005. In an order filed on February 4, 2011,[1] the habeas court vacated Morrow's

---

[1] We note with concern the fact that Morrow's habeas petition was pending in the habeas court for nearly nine and a half years, which is twice as long as it took to bring this matter to a verdict in the trial court. We urge the habeas courts to make every reasonable effort in death

death sentence based on the alleged ineffective assistance of Morrow's trial counsel in the sentencing phase of Morrow's trial, but the habeas court refused to disturb Morrow's convictions. In Case Number S11A0937, the Warden has appealed the vacating of Morrow's death sentence, and Morrow has cross-appealed in Case Number S11X0938. In the Warden's appeal, we reverse and reinstate Morrow's death sentence. In Morrow's cross-appeal, we affirm.

## I. *Factual Background*

The evidence at Morrow's trial showed that Morrow dated and lived with Barbara Ann Young but that, beginning at least by early December of 1994, Ms. Young was beginning to lose interest in Morrow. On December 6, Morrow slapped Ms. Young and dragged her by her arm in her own home. On December 9, Morrow was giving a ride to Ms. Young, but he refused to drop her at the college that she was attending and, instead, beat her and raped her twice. After this incident, Ms. Young made Morrow move out of her home. On December 24, Ms. Young fled her home, where Morrow had been visiting, and ran to a neighboring home seeking refuge and saying that Morrow was going to kill her.

Finally, on December 29, 1994, Tonya Woods and LaToya Horne were visiting Ms. Young, and two of Ms. Young's children were also present in the home as witnesses to the events that transpired there. Morrow and Ms. Young argued over the telephone. Later, Morrow entered Ms. Young's home, stood at the entrance to the kitchen, argued with Ms. Woods, and began shooting the nine-millimeter handgun he had brought. Morrow shot Ms. Woods in her abdomen, severing her spine and paralyzing her, and Ms. Woods fell backwards to the floor over a chair. Morrow then shot Ms. Horne in her arm, and he also possibly fired at Ms. Young as she fled from the kitchen. Morrow pursued Ms. Young down a hallway and kicked open her bedroom door. Morrow and Ms. Young struggled in the bedroom. A shot was fired inside the bedroom, likely injuring Ms. Young's back from the action of the gun and burning Ms. Young's hand. The bullet passed through the closed bedroom door and into the ceiling in the hallway outside. Ms. Young fled the bedroom, but Morrow pursued her into the hallway. Morrow likely smashed her head into the bedroom's doorframe, leaving behind skin, hair, and blood. Morrow then grabbed her by her hair as she lay on the floor, and he fired a fatal shot into her head above her right ear. This fatal shot was likely fired as she attempted to shield her head with her left hand, which was shot through the palm. Morrow then returned to the kitchen,

penalty cases to adhere to the time limitations imposed under Uniform Superior Court Rule 44.

where he either cleared a jam in the gun or reloaded it. He fired a fatal shot under Ms. Woods' chin and into her head at close range, and he shot Ms. Horne in the face and arm. Morrow left the home, cut the telephone line outside, and then fled. Ms. Young and Ms. Woods died of their wounds. Ms. Horne was badly injured, but she managed to walk from house to house down the street seeking someone to call for help before she eventually collapsed; she survived, but with permanent injuries, including deafness in one ear.

## II. *Alleged Ineffective Assistance of Counsel*

The habeas court concluded that Morrow's trial counsel rendered ineffective assistance in their preparation for and performance in the sentencing phase of Morrow's trial but not in the guilt/innocence phase. In order to prevail on an ineffective assistance of counsel claim, a petitioner must show that his trial counsel rendered constitutionally-deficient performance and that actual prejudice of constitutional proportions resulted. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783-784 (1) (325 SE2d 362) (1985). See also *Rompilla v. Beard*, 545 U. S. 374 (125 SC 2456, 162 LE2d 360) (2005) (applying *Strickland*, 466 U. S. 668); *Wiggins v. Smith*, 539 U. S. 510 (123 SC 2527, 156 LE2d 471) (2003) (same). We adopt the habeas court's findings of fact unless they are clearly erroneous, but we apply the facts to the law de novo in determining whether trial counsel performed deficiently and whether any deficiency was prejudicial. See *Strickland*, 466 U. S. at 698 (IV); *Head v. Carr*, 273 Ga. 613, 616 (4) (544 SE2d 409) (2001). Trial counsel are "strongly presumed" to have performed adequately; therefore, a petitioner bears the burden to prove otherwise. *Strickland*, 466 U. S. at 690 (III) (A). In assessing the degree to which counsel's deficiencies might have prejudiced a petitioner's defense, we consider the cumulative effect of all of trial counsel's deficiencies within the context of everything that occurred at trial. See *Schofield v. Holsey*, 281 Ga. 809, 812, n. 1 (642 SE2d 56) (2007) (holding that the combined effect of trial counsel's various professional deficiencies should be considered). In the interest of judicial efficiency, this Court may simply assume certain alleged deficiencies to have existed and then weigh any prejudice that might have resulted in the final analysis of prejudice arising from counsel's deficiencies. *Lajara v. State*, 263 Ga. 438, 440-441 (3) (435 SE2d 600) (1993) (noting that an appellate court need not address whether counsel was deficient if the claim can be rejected based on a lack of prejudice).

To show sufficient prejudice to warrant relief, a petitioner must show that "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different [cit.]." *Smith*, 253 Ga. at 783 (1). The Warden incorrectly argues that the prejudice standard applied by the habeas court in Morrow's case was erroneous. Under Georgia's death penalty laws, which provide for an automatic sentence less than death if the jury is unable to reach a unanimous sentencing verdict, a reasonable probability of a different outcome exists where "there is a reasonable probability that at least one juror would have struck a different balance" in his or her final vote regarding sentencing following extensive deliberation among the jurors. *Wiggins*, 539 U. S. at 537 (III). See OCGA § 17-10-30 (providing, both before and after being amended in 2009, that a sentence of death may only be imposed upon a jury's verdict recommending one).

For the reasons discussed below and upon our plenary review of the trial and habeas court records, we conclude that trial counsel generally performed adequately and that the absence of trial counsel's professional deficiencies, both those we find to have existed and those we assume to have existed, would not in reasonable probability have resulted in a different outcome in either phase of Morrow's trial.

A. *Actual Preparation and Performance*

1. *Preparation of Evidence*

We begin our analysis of the assistance trial counsel rendered by summarizing their pre-trial preparations. Counsel focused much of their efforts on supporting a possible defense theory that was based on the allegedly-spontaneous nature of the murders, and they attempted to prepare evidence of Morrow's background and mental state that would support their theory that he had acted impulsively and out of character. Counsel testified that they believed that the "domestic circumstances of the case" could possibly support a verdict of voluntary manslaughter, and they pressed the State to consider a plea bargain to life without parole based on this characterization of the murders.

Trial counsel met repeatedly with Morrow, his mother, and his sister, and the record makes clear that counsel discussed Morrow's childhood background with them extensively, despite the fact that counsel believed that a sound strategy would be to focus on Morrow's character as an adult. Counsel found Morrow's sister to be a more-reliable source of information than his mother. Contrary to Morrow's argument, it is simply not correct that trial counsel ignored information from the years during Morrow's childhood when he lived in New York and New Jersey, although we acknowledge that they relied

heavily on Morrow, his mother, and his sister to provide information about that portion of Morrow's life. Counsel testified that they also contacted jail staff, Morrow's former co-workers, and numerous other potential witnesses. Counsel obtained funds for a private investigator, and counsel testified that they closely monitored the investigator's progress and that the investigator "concentrated about 65 percent of his efforts on mitigation witnesses." The investigator testified that he was relatively inexperienced in mitigation investigations; however, we note that trial counsel retained ultimate responsibility for the defense strategy.

Counsel had Morrow examined by a psychiatrist. The psychiatrist's report stated that Morrow's mother had been "battered" by Morrow's father and that Morrow had been "abandoned" by his father, had been "picked on" as a child because he was on welfare, and was currently depressed and remorseful. However, the psychiatrist's report also unflatteringly indicated that Morrow had been suspended from school numerous times for fighting, that Morrow had battered his ex-wife and his girlfriend, and that Morrow had a diagnosis of alcoholism, polysubstance abuse, and a personality disorder that included "anti-social" features. The psychiatrist's report indicated a sexual history that was unremarkable, except perhaps for the fact of Morrow's promiscuity with women. After concluding that the psychiatrist's report was potentially harmful to the defense on the whole, counsel eventually arranged for Morrow to be examined repeatedly by a psychologist in an effort to get Morrow to open up more about his background, to prepare Morrow emotionally to testify well, and to prepare the psychologist's possible trial testimony, which is outlined below. Before having Morrow examined, counsel briefed the psychologist on what their investigation had revealed about Morrow, and the psychologist never expressed to counsel any concern that additional information was necessary to his conclusions.

Counsel and their investigator made reasonable attempts to contact a person who reportedly had served as a personal mentor to Morrow when he lived in the Northeast, to contact members of Morrow's extended family through Morrow's mother, and to obtain Morrow's school records and childhood psychological records. Counsel considered hiring a social worker but concluded that there was no need for one in the light of the preparation that they, their investigator, and their psychologist were doing.

2. *Presentation of Evidence*

At trial, counsel presented the following evidence: In the guilt/innocence phase, counsel presented testimony from an investigator to explain that Ms. Young had not referred to the incident where Morrow kidnapped her and had sex with her as a "rape" and

that Morrow had beaten her with his fist rather than with a gun during that incident. Morrow's sister testified about Morrow's background in an effort to show Morrow's good character, his past good treatment of Ms. Young, and his distress at the time of the murders. Trial counsel then concluded the guilt/innocence phase with testimony from Morrow himself, in which he described his history with Ms. Young, gave explanations about his alleged past abuse of her that were more favorable to himself than the State's evidence about those incidents, and explained how he had reacted impulsively to Ms. Woods' insulting comment to him about Ms. Young's no longer wanting to be in a relationship with him. At the conclusion of the guilt/innocence phase, counsel argued to the jury that Morrow had "snapped."

In the sentencing phase, trial counsel attempted to carry forward their theme about Morrow's good character through the following witnesses: several of Morrow's former co-workers; a detention officer who had formed a favorable opinion of Morrow; a volunteer minister who explained Morrow's good behavior in the jail and his potential to minister to other inmates; a pastor who described Morrow as "dependable" and "sincere" and as being remorseful for his crimes; a friend who had known Morrow for ten years who spoke favorably of Morrow's lack of a bad temper, his involvement with his children, and his respect for his mother; Morrow's ex-wife who described Morrow as being quiet, rarely abusive, and involved with his children; Morrow's ex-wife's new husband who described Morrow as being "the perfect father"; Morrow's half-sister who described him as being "a kind, loving person" who did not lose his temper; and a former girlfriend who described Morrow as not being abusive and as being fearful of getting hurt emotionally. Morrow's sister testified about her father's abuse of Morrow's mother, including stomping on her and causing her to miscarry, and about how Morrow had attempted to protect her. Contrary to Morrow's current description of the portion of his life he spent in the Northeast after Morrow's mother's divorce, Morrow's sister described her memories of that time period as "pretty good." However, she explained that Morrow was bullied in school and that his mother "tried to make him be a man." She also outlined Morrow's life in general terms, including things such as how he had helped his mother with her nursing care business, was close to his mother, and was involved in church as a child. She explained that Morrow had been under stress because he feared that he was losing his children and because his aunt had recently died.

Counsel presented the testimony of a psychologist who had evaluated Morrow repeatedly. The psychologist testified that Morrow showed elevated scores for "paranoia," "hysteria," poor impulse

control, exaggerated masculinity, depression, and anxiety. He stated that Morrow had been in special education classes since the fourth grade for reasons other than his behavior. He explained that Morrow had suffered from a sense of helplessness because he had been unable to protect his mother from abuse first by his father and later by his mother's boyfriend. He described how Morrow had reacted to being belittled by Ms. Woods on the day of the murders and had gone into a dissociative state as a result of the incident.

Finally, trial counsel presented testimony from Morrow's mother. She explained that her ex-husband had abused her severely, even stomping on her and causing her to miscarry, and that Morrow had tried to protect her. She outlined her and Morrow's life histories, and she included some discussion of the period during which Morrow lived in the Northeast. She explained how she had once spanked Morrow in front of his friends at school, and she discussed Morrow's academic problems. Her testimony concluded with a plea as a mother for Morrow's life to be spared.

In light of the summary of trial counsel's efforts outlined above and in light of our plenary review of the trial and habeas records, we conclude that it is simply not correct that trial counsel failed to investigate Morrow's background, including the period he spent in the Northeast. Counsel did such an investigation, but they reasonably relied on Morrow and his immediate family members to reveal that information.

B. *Evidence that Trial Counsel Allegedly Failed to Discover*

We now turn to the evidence that trial counsel allegedly should have discovered that they did not. The habeas court concluded that trial counsel performed deficiently in preparing for the sentencing phase. Morrow argues that trial counsel failed to discover evidence falling mainly into two categories,[2] information about the portion of Morrow's life that he spent in the Northeast and information available through an independent forensic expert. As we explained above in our general discussion of the applicable standards of review, our assessment of how a jury might have reacted to the additional evidence that Morrow has presented in the habeas court is an assessment of the legal question of prejudice, which we perform de novo.

1. *Information about Morrow's Life in the Northeast*

The habeas court found that trial counsel performed deficiently in their efforts to discover "testimony and records documenting

---

[2] We also note the evidence that Morrow was born prematurely; however, like the habeas court apparently did, we find nothing compelling about this evidence and the speculative possibility that it could have had lasting effects on his mental state.

Petitioner's childhood in the New York City area." The habeas court assumed that Morrow was psychologically harmed by being sometimes left by his mother unsupervised or in the care of unreliable or unsavory persons, including Morrow's blind grandfather together with another man who was known to drink. However, our review of the record reveals that a jury would have found this characterization of how Morrow himself[3] was ever harmed to be overstated, and we also note that the jury actually did hear testimony at trial about how Morrow and his sister would sometimes be left alone while their mother was away. The habeas court noted that testimony at trial indicated that Morrow's mother moved to the Northeast to escape her badly abusive husband, but it found that new evidence suggested that the move was also partly motivated by sexual abuse Morrow's sister had suffered. However, Morrow's sister testified that she did not tell Morrow about the abuse until after he was arrested, meaning it could not have affected his conduct during the murders. The habeas court notes testimony that, when Morrow was living in his aunt's home in Brooklyn, his aunt and her boyfriend were unkind to him and his sister and disciplined them harshly and that the other children in the home bullied him. We find this new testimony to be less than compelling as alleged proof of trial counsel's failings and resulting prejudice, particularly because testimony was actually presented at trial about how Morrow had been bullied often as a child and had been punished by his mother for not standing up for himself and for misbehaving.

Morrow presented evidence in the habeas court suggesting that he had been raped by his cousin as a child. However, we note that Morrow never reported any such rapes pre-trial to his counsel or to the mental health experts who questioned him about his background, including his sexual history. We disagree with the habeas court's suggestion that trial counsel should have been alerted to the alleged rapes simply because Morrow was known to wet the bed and to have some adjustment problems as a child or because the alleged perpetrator had once allegedly attempted to molest another cousin on a dare. Finally, although we do not find that counsel performed deficiently in failing to discover Morrow's alleged rapes, particularly because Morrow himself never made such allegations pre-trial, we also note with regard to any resulting prejudice that Morrow's only direct evidence of the alleged rapes even in the habeas court was his own statement to a psychologist. We have said the following about

---

[3] Morrow's sister testified in the habeas court that the sighted man once molested her. However, there is no evidence that she ever disclosed this to trial counsel pre-trial during their numerous consultations with her, and there is no evidence that Morrow had any knowledge of the incident prior to his crimes.

such circumstances:

> Although an expert witness may rely on the statements of others in forming his or her expert opinions, those opinions should be given weight only to the extent that the statements upon which they rely are themselves found to have been proven reliable. An expert witness must not be permitted to serve merely as a conduit for hearsay. Therefore, in considering whether a jury in reasonable probability would have been swayed by additional testimony not presented by counsel, we do not assume the correctness of the facts alleged in the experts' affidavits but, instead, we consider the experts' testimony in light of the weaker [evidence] upon which that testimony, in part, relied.

*Whatley v. Terry*, 284 Ga. 555, 565 (V) (A) (668 SE2d 651) (2008) (footnotes omitted). Thus, we conclude that the testimony of Morrow's expert about Morrow's recent allegations about the rapes would not have been given great weight by the jury.

The habeas court highlighted Morrow's evidence suggesting that his mother had dated a man who was "cruel and controlling," would force Morrow to help him do his janitorial work, would punish Morrow with a belt,[4] and would abuse Morrow's mother. We note, however, that trial counsel did present testimony at trial from a psychologist showing that the boyfriend had been abusive to Morrow's mother and had once cruelly mocked Morrow when he attempted to defend his mother with a baseball bat.

The habeas court notes evidence presented in the habeas court suggesting one of Morrow's mother's later boyfriends might have sexually abused Morrow's sister. However, our review of the record does not reveal that Morrow was ever aware of this alleged abuse; therefore, it would not have affected the jury's assessment of his moral culpability in the murders if it had been presented at trial.

Although we do not enumerate all of the examples here, we note that much of the habeas court's order is simply a recitation of the same basic life history that was outlined for the jury at trial.

Finally, the habeas court discusses the new testimony presented by the psychologist who testified at Morrow's trial. The habeas court found that the psychologist's testimony would have been enhanced if the psychologist had been aware of the additional alleged emotional

---

[4] We note that the testimony in the habeas court was somewhat inconsistent regarding the degree of harshness involved. We also note that there was inconsistent testimony about whether this boyfriend might have made sexual comments to Morrow's sister, although we also note that there was no evidence showing that Morrow was aware of those alleged comments.

traumas that Morrow had faced as a child. As we have outlined above, the psychologist's trial testimony reveals that his pre-trial evaluation of Morrow through repeated interviews with him was thorough, and his trial testimony set forth a compelling picture for the jury. We find that the additional matters discussed above, including such things as Morrow's having been treated badly in his aunt's home and the additional evidence of his having been mistreated by his mother's boyfriend, would not have significantly enhanced the psychologist's trial testimony in the eyes of the jury. As to Morrow's essentially-unsubstantiated claim of rape, our discussion above demonstrates that trial counsel did not perform deficiently regarding those allegations because Morrow never revealed them pre-trial and that those allegations, which are based essentially on only Morrow's own report, would have been regarded as suspect by the jury even if we were to assume that they should have been discovered pre-trial.

2. *Information from an Independent Forensic Expert*

Morrow presented testimony from an expert in forensics. We find that, even assuming the correctness of this expert's new testimony, there is no substantial prejudice as to either phase[5] of Morrow's trial arising out of trial counsel's failure to present similar testimony.

First, the expert claims that the evidence at the crime scene shows that Ms. Woods was standing rather than sitting when Morrow shot her, causing her to fall backwards over a chair. Although this testimony would have tended at trial to confirm Morrow's version of how the three victims were arranged in the room when he started shooting them, it would not have had a significant impact on the jury in light of the fact that the evidence was clear that Morrow began shooting simply because he was upset by what Ms. Woods had said to him rather than because of any threat he sensed. In fact, Ms. Horne herself testified at trial in a manner consistent with Morrow's new expert testimony, as she claimed that she "remember[ed] Tonya falling back in the chair." Thus, we conclude that trial counsel's failure to obtain expert testimony like this was not prejudicial.

Second, Morrow's new expert has testified, contrary to the extensive expert testimony at trial, that Ms. Young's hand was shot through during the struggle in her bedroom and that the shot then grazed her forehead. This contrasts with the State's evidence at trial

---

[5] The issue of trial counsel's performance regarding potential testimony from a forensic expert during the sentencing phase is raised in the Warden's appeal, and it is raised regarding the guilt/innocence phase in Morrow's cross-appeal.

showing that a shot was fired inside the bedroom but did not strike Ms. Young, that Ms. Young's forehead likely was injured when her head struck a doorframe during the struggle, and that Morrow then injured Ms. Young's hand when he shot through it and into the side of her head as she shielded herself. Morrow actually relied on the State's testimony showing that the injury to Ms. Young's forehead was not from a gunshot to argue to the jury that the injury could have been simply the result of a fall. Our review of Morrow's new expert testimony leads us to conclude that Morrow cannot show prejudice for two reasons. First, we believe that the jury would, like us, favor the testimony of the State's experts upon reviewing the two contrasting accounts of precisely how the struggle with Ms. Young transpired prior to the final shot to her head. Second, even if the jury chose to believe the version of events set forth by Morrow's new expert, that version would not be significantly mitigating, because it still depicts Morrow as having struggled with Ms. Woods for the gun in the bedroom, chasing her as she fled into the hallway, grabbing her by her hair as she lay helpless on the floor, and shooting her in the head.

Finally, Morrow's new expert testified that the clicking sound heard by Ms. Horne and the unspent bullet on the floor next to Ms. Woods' feet could have been the result of Morrow's clearing a jam in his gun rather than his reloading. We find this testimony not to be mitigating for two reasons. First, the testimony would have been essentially cumulative of similar testimony from an expert for the State, which the State even highlighted in its closing argument. Second, regardless of whether Morrow was clearing a jam in his gun or reloading, it is clear that he was taking active steps to prepare his gun to continue his murderous rampage.

C. *Form of the Sentencing Verdict*

In his argument regarding the form of the sentencing verdict, which is discussed further below, Morrow argues that his trial counsel rendered ineffective assistance by failing to object. Specifically, Morrow argues that it is not possible to determine from the jury's verdict if the jury, having clearly found in its verdict multiple statutory aggravating circumstances for each of the individual murders, concluded that a death sentence was the appropriate sentence for the murder of Barbara Ann Young, for the murder of Tonya Woods, or for each of those murders. See OCGA § 17-10-31 (providing that, except in cases of treason or aircraft hijacking, a death sentence may only be imposed upon a finding of one or more statutory aggravating circumstances); OCGA § 17-10-30 (b) (setting forth the statutory aggravating circumstances). We conclude that there is no reasonable probability that the jury would have imposed anything less than two separate death sentences for the two murders

if trial counsel had successfully objected to the form of the sentencing verdict.

D. *Combined Effect of Individual Ineffective Assistance Claims*

In light of the foregoing discussion regarding the various ways in which we have found or have assumed trial counsel's performance to have been deficient, we conclude that there is not a reasonable probability that the absence of those deficiencies would have changed the outcome of either phase of Morrow's trial. See *Holsey*, 281 Ga. at 812, n. 1 (considering the combined effect of trial counsel's deficiencies); *Lajara*, 263 Ga. at 440-441 (3) (rejecting a claim solely on the basis of a lack of prejudice). Accordingly, we refuse to disturb Morrow's convictions and order Morrow's death sentence reinstated.

III. *Remaining Cross-Appeal Claims*

A. *Compositions of the Grand and Traverse Juries*

Morrow claims that the compositions of his grand and traverse juries were unconstitutional and violated OCGA § 15-12-40 because Hispanic persons were under-represented on the lists from which those juries were drawn. The habeas court correctly concluded that it was not free to re-examine this claim on habeas corpus, because the claim was decided adversely to Morrow on direct appeal. See *Hall v. Lance*, 286 Ga. 365, 376 (III) (687 SE2d 809) (2010) (holding that matters decided on direct appeal may not be re-examined by the habeas courts); *Morrow*, 272 Ga. at 692-695 (1) (addressing Morrow's jury composition claim on direct appeal). Morrow argues that the habeas court should have re-opened this claim, arguing that the release of the 2000 Census has revealed new facts which should now be considered. See *Lance*, 286 Ga. at 376 (III) (noting that habeas courts "should not reconsider issues previously addressed by this Court where there has been no change in the law or the facts since this Court's decision"); *Bruce v. Smith* 274 Ga. 432, 434 (2) (553 SE2d 808) (2001) (noting that, "[w]ithout a change in the facts or the law, a habeas court will not review an issue decided on direct appeal"). But see *Head v. Hill*, 277 Ga. 255, 257 (II) (A) (1) (587 SE2d 613) (2003) (noting that a claim based on new *law* may only serve as the basis for habeas corpus relief if the new law is of the type that is given retroactive effect). This Court allows claims to be revisited on habeas corpus where new facts have developed since the time of the direct appeal not because the Court intends to allow prisoners to have a second chance to *prove* their claims but, instead, because a claim that is based on facts that did not actually exist at the time of direct appeal is essentially a different claim. We reject Morrow's argument that his jury composition claim should be re-opened, because we find that he has pointed merely to a new *means* by which

the relevant facts might be proven rather than to any new underlying facts. His present claim does not present a new claim. Furthermore, even if this claim were not barred by res judicata, it would lack merit in light of our holding that jury commissioners properly rely on the most-recent Decennial Census that is available at the time jury lists are constructed. See *Williams v. State*, 287 Ga. 735 (699 SE2d 25) (2010).

B. *Proportionality of Morrow's Death Sentence*

This Court held on direct appeal that the death penalty was not disproportionate punishment in Morrow's case. See *Morrow*, 272 Ga. at 703 (17). However, Morrow argues that this Court should re-examine that question, particularly in light of the new evidence that he has presented in the habeas court. As this Court has done in the past, we pretermit whether a re-examination of the proportionality of a death sentence by this Court on habeas corpus might ever be appropriate. Instead, we simply conclude that no cause to consider doing so exists in this case, a case that involves two especially-brutal murders and clear evidence of escalating prior violence toward the main target of Morrow's discontent, Ms. Young. See *Schofield v. Meders*, 280 Ga. 865, 871 (8) (632 SE2d 369) (2006) (stating that the Court "perceive[d] no reason to re-examine the issue [of proportionality]"); *Fleming v. Zant*, 259 Ga. 687, 688-689 (2) (386 SE2d 339) (1989) (refusing to "reach the issue of whether there may be some circumstances under which a second proportionality review would be appropriate").

C. *Form of the Sentencing Verdict*

As was noted above in the discussion of the alleged ineffective assistance of counsel, Morrow argues that the form of the jury's sentencing verdict in his trial was improper in that it did not clearly indicate that the jury had unanimously recommended a death sentence for either of the two individual murders but, instead, simply found multiple statutory aggravating circumstances regarding each of the individual murders and recommended one unified death sentence. The habeas court erred by finding this claim to be barred as previously litigated, because, although the underlying facts of the issue were briefly noted by this Court sua sponte in a footnote outlining the procedural history of the case, the issue was not raised as a distinct claim in Morrow's appeal. See *Morrow*, 272 Ga. at 692, n. 1 (noting the form of the jury's sentencing verdict). However, the habeas court correctly found in the alternative that this claim was barred by procedural default. See *Hall v. Brannan*, 284 Ga. 716, 725-726 (III) (670 SE2d 87) (2008). The bar to procedurally-defaulted claims can be overcome by satisfying the cause and prejudice test, and the showing of "cause" under that test can be made by demonstrating that counsel rendered ineffective assistance

under constitutional standards. See id. However, Morrow's counsel cannot be regarded as having rendered deficient performance on appeal, because they could not have successfully raised a claim about the jury's sentencing verdict on direct appeal in light of the fact that the issue had not been preserved by objection at trial. Likewise, as is discussed above, Morrow cannot show the ineffective assistance of his counsel at trial, because he has failed to show that an objection at trial would have in reasonable probability led to anything other than the imposition of *two* death sentences, one for each of the murders. Thus, Morrow's attempt to rely upon ineffective assistance of counsel to satisfy the cause and prejudice test fails, and this claim remains barred by procedural default.

D. *Claims that are Deemed Abandoned*

In a footnote, Morrow has purported to incorporate all remaining issues that he raised in the habeas court. These unspecified, unsupported claims are deemed abandoned. See Supreme Court Rule 22; *Hall v. Terrell*, 285 Ga. 448, 457 (III) (679 SE2d 17) (2009).

*Judgment reversed in Case No. S11A0937. Judgment affirmed in Case No. S11X0938. All the Justices concur.*

DECIDED OCTOBER 17, 2011.

*Samuel S. Olens, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Patricia A. Burton, Senior Assistant Attorney General, Lyndsey J. Hurst, Sabrina D. Graham, Assistant Attorneys General*, for appellant.

*Brian Kammer, Thomas H. Dunn, Marc F. Holzapfel*, for appellee.