S10A0598. WILLIAMS v. THE STATE.
(699 SE2d 25)

HUNSTEIN, Chief Justice.

The State is seeking death sentences against appellant Floyd Wayne Williams in connection with the deaths of two persons. This Court granted appellant's application for interim review to consider pre-trial whether the list from which appellant's traverse jury will be selected was composed in an unconstitutional manner.

The evidence presented in the trial court showed that the jury commission in Clayton County, pursuant to this Court's directive in the Unified Appeal Procedure, attempted to balance the percentages of various cognizable groups of persons on the traverse jury source list to match the percentages of those groups of persons reported in the most-recently-available Decennial Census. See U.A.P. II (C) (6), (II) (E).[1] As a result of this attempted forced balancing, there was no significant disparity between the percentage of African-American persons appearing on the traverse jury source list and the percentage

---

[1] Rule (C) (6) of the Unified Appeal Procedure requires the trial court to review the traverse jury list "to determine whether all of the cognizable groups in that county are fairly represented." See id. at (a) (setting forth the method of establishing the existence of a "cognizable group"). The trial court is then required to compare the percentages of each cognizable group in the county, according to the most recent official Decennial Census figures, with the percentages represented on the traverse jury list. Significant under-representation of any such group on the traverse jury list should be corrected prior to trial. Id. at (b). Rule II (E) of the Unified Appeal Procedure sets forth the forms for the jury certificates required by Rule II (B) (6) to demonstrate that there is no significant under-representation, i.e., that the difference in the percentages compared is less than five percentage points.

of African-American persons in the population of Clayton County as measured by the 2000 Census. However, appellant presented evidence in the trial court suggesting that demographic changes in Clayton County since the 2000 Census have resulted in an increase in the current African-American population of 17.49 percentage points. Appellant argues that, because the source list from which his traverse jury will be selected has been balanced to match the 2000 Census rather than the current demographics of the county, that source list is unconstitutional.

In *Ramirez v. State*, 276 Ga. 158 (575 SE2d 462) (2003), this Court considered this same legal question under facts that were slightly less striking. In *Ramirez*, this Court was confronted by an under-representation of African-American persons on a grand jury source list of 11.9 percentage points. That under-representation had resulted, as in appellant's case, from demographic changes that had occurred since the last Decennial Census. We considered Ramirez's claim under the equal protection clause of the Fourteenth Amendment, under the fair cross-section guarantee of the Sixth Amendment, and under OCGA § 15-12-40, and we found no error. We now apply that same pattern of analysis to appellant's claim, and we again find no error.

1. To make a prima facie claim directly under the equal protection clause of the Fourteenth Amendment, appellant

> was required to demonstrate that African-American persons were a recognizable, distinct class of persons, that they were under-represented over a significant period of time or under other circumstances which raised an inference of discrimination, and that the selection procedure employed was susceptible of abuse or was not racially neutral such that any presumption of discrimination raised by the statistics was supported. [Cits.]

*Ramirez v. State*, supra, 276 Ga. at 159 (1) (b). We have noted that the Decennial Census is the only "comprehensive county-wide head count" available to jury commissions and that jury commissions throughout the State of Georgia need "a valid population benchmark" to guide them in ensuring adequate representation of various groups of persons. *Smith v. State*, 275 Ga. 715, 719 (3) (571 SE2d 740) (2002). Accordingly, this Court, through the Unified Appeal Procedure, has continued to mandate the statewide use of this comprehensive source of data as an objective, readily-implemented test of whether cognizable groups are adequately represented on jury source lists. Because use of the Decennial Census as a benchmark has been adopted by this Court for the very purpose of promoting

adequate representation of cognizable groups and because the demographic changes at issue in appellant's case "were obviously beyond the control of the county's jury commissioners," *Ramirez v. State*, supra at 161 (1) (b), we conclude that appellant has failed to show that the jury selection procedure in his case "was susceptible of abuse or was not racially neutral." Id. Accordingly, we conclude that appellant cannot make a prima facie claim of intentional discrimination under the equal protection clause of the Fourteenth Amendment. Our judgment in this regard is not affected by the suggestion by the dissent that the statewide reliance on the Decennial Census mandated by this Court is somehow discriminatory because in this case that reliance has, as we assume here, resulted in under-representation. First, we note that the very purpose of this Court's mandated reliance on the Decennial Census is to remove even the *possibility* of discriminatory actions by individual decision-makers throughout Georgia. Second, we find it informative that the case upon which the dissent relies, *Castaneda v. Partida*, 430 U. S. 482 (97 SC 1272, 51 LE2d 498) (1977), *itself* invokes the Decennial Census as an objective and reliable benchmark.

2. In addition to a direct application of the Fourteenth Amendment to jury composition claims, this Court has also assumed that the fair cross-section guarantee of the Sixth Amendment applies to the states through the Fourteenth Amendment. See *Ramirez v. State*, supra, 276 Ga. at 161 (1) (c). This Court has further held that a fair cross-section is also guaranteed by OCGA § 15-12-40 under standards "comparable if not identical" to Sixth Amendment standards. Id. To make a prima facie claim of a fair cross-section violation, a defendant must show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group [on the jury source list] is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury selection process. [Cits.]

*Morrow v. State*, 272 Ga. 691, 692 (1) (532 SE2d 78) (2000). A fair cross-section claim is "almost identical" to a claim raised directly under the equal protection clause of the Fourteenth Amendment, "with the one prominent exception being that the claimant need not demonstrate any *intent* to under-represent a cognizable group. [Cit.]" (Emphasis in original.) *Ramirez v. State*, supra, 276 Ga. at 161-162 (1) (c). However,

> a prima facie showing of a fair cross-section violation can be rebutted if the State can demonstrate that "attainment of a

fair cross section [is] incompatible with a significant state interest." [Cit.]

Id. at 162 (1) (c).

In *Ramirez v. State*, supra, 276 Ga. at 162 (1) (c), we concluded that obtaining comprehensiveness and objectivity through the use of the Decennial Census was a "sufficiently significant state interest" to rebut an otherwise-valid prima facie fair cross-section claim based on an under-representation of African-American persons by 11.9 percentage points. See *Morrow v. State*, supra, 272 Ga. at 692-693 (1). In appellant's case, all relevant factors remain the same as they were in *Ramirez* except that African-American persons in appellant's case were, as we assume here, under-represented by 17.49 percentage points. As we noted above, the Unified Appeal Procedure provides a statewide procedure for creating and evaluating jury source lists, and that method was designed by this Court to promote adequate representation of cognizable groups through the use of a comprehensive and objective standard, the same standard that is invoked with unqualified confidence in the case relied upon by the dissent. See *Castaneda v. Partida*, supra, 430 U. S. 482. Although, in some instances, that procedure may create temporary, self-rectifying anomalies as Decennial Census reports grow old, we conclude that the ill done by those temporary anomalies is outweighed by the other benefits of the procedure. Based upon our careful consideration of the issue, we hold that a continued adherence to the requirements of the Unified Appeal Procedure regarding the balancing of cognizable groups to match the most-recent Decennial Census is justified by a sufficiently-significant state interest. Therefore, we conclude that appellant's prima facie showing of a fair cross-section violation has been rebutted.

*Judgment affirmed. All the Justices concur, except Melton, J., who dissents.*

MELTON, Justice, dissenting.

Because the trial court failed to make any findings as to the reliability of evidence submitted by Floyd Wayne Williams that African-Americans were underrepresented in the Clayton County traverse jury pool by 17.49 percent, I believe that the trial court's order rejecting Williams' challenge to the jury composition should be vacated and this case should be remanded for further proceedings. Therefore, I respectfully dissent from the majority's opinion.

The record shows that, in support of his Sixth Amendment, Fourteenth Amendment, and OCGA § 15-12-40 claims, Williams provided expert testimony based on 2007 Census Bureau population

estimates for Clayton County derived from the United States Census Bureau's American Community Survey (ACS). Williams' expert testified that, under the 2007 ACS, the absolute disparity between the citizen population and the traverse jury list for African-Americans was 17.49 percent. The trial court's order made no reference to the ACS population statistics or made any findings of fact as to its reliability.

Despite these deficiencies, the majority opinion affirms the trial court by simply relying on the fact that "the Decennial Census as a benchmark has been adopted by this Court for the very purpose of promoting adequate representation of cognizable groups. . . ." Using the Decennial Census as an automatic and absolute shield against Williams' claims of underrepresentation, the majority goes on to conclude that, because any demographic changes were beyond the control of the county's jury commissioners, Williams cannot make a prima facie equal protection claim.[2] The majority's analysis begins and ends with the use of the Decennial Census. However, nowhere in our jurisprudence is the notion that jury commissioners need only blindly rely on the Decennial Census to insulate against attacks on the jury selection process. A procedure that is race neutral, secure from abuse, and free of manipulation can still result in unconstitutional underrepresentation if the procedure loses track of demographic realities beyond what is constitutionally permitted. This is the question that Williams sought to address, that the trial court overlooked, and that the majority now renders irrelevant.

Since the trial court did not address this question, its analysis of Williams' claim is incomplete. See, e.g., *Morrow v. State*, 272 Ga. 691, 695 (532 SE2d 78) (2000) (since the trial court *found the defendant's statistics to be unreliable*, the Supreme Court accepted this finding of fact on appeal). The disparity alleged by Williams is significant, as this Court has found that "an absolute disparity between the percentage of a group in the population and its percentage in the jury pool of less than 5% is almost always constitutional; an absolute disparity between 5 and 10% is usually constitutional; and an absolute disparity of over 10% is probably unconstitutional." Id. at 692. See also *West v. State*, 252 Ga. 156, 157 (1) (313 SE2d 67) (1984) (17% absolute disparity for females in jury pool from females in county population violates OCGA § 15-12-40). If the 17.49 percent disparity is found to be reliable, this statistic could be sufficient for a prima facie case under both the Sixth and Fourteenth Amendments. See *Jones v. Georgia*, 389 U. S. 24 (88 SC 4, 19 LE2d 25) (1967) (holding that the mathematical disparity between 19.7% of

---

[2] The majority also does not adequately address Williams' Sixth Amendment claim, which can be proven without demonstrating any intent.

African-Americans in the population and 4.7% of African-Americans on grand jury lists was adequate for a prima facie case under an equal protection analysis); *Sanders v. State*, 237 Ga. 858 (230 SE2d 291) (1976) (finding that although there was no showing of an opportunity to discriminate, a disparity of 14.5% was not fairly representative of the community as a matter of law). See also *Ramirez v. State*, 276 Ga. 158, 161 (575 SE2d 462) (2003) (finding that the same statistical thresholds are applicable to equal protection claims and fair cross-section jury claims). Therefore, it is paramount that the trial court thoroughly consider the reliability of the ACS population statistic prior to issuing any ruling.

The majority opinion states that, because this Court has previously stated that the Decennial Census is an objective comprehensive source of data, the trial court cannot err as long as it relies on a decennial census, irrespective of other evidence presented by a defendant. This statement is wrong. See *Castaneda v. Partida*, 430 U. S. 482, 497 (97 SC 1272, 51 LE2d 498) (1977) (finding that although the facial constitutionality of the jury selection system in Texas was accepted by the Supreme Court, it was still unconstitutional as applied). While the Decennial Census may be the most convenient source of reliable evidence regarding the makeup of a county's population, it does not follow that it is the only source of reliable information — or that it remains accurate throughout its shelf life. That is why a trial court must fully consider additional evidence presented by a defendant and determine its reliability.

The majority attempts to evade this issue by mischaracterizing the dissent. The majority states that this dissent suggests that "the statewide reliance on the Decennial Census mandated by this Court is somehow discriminatory because in this case that reliance has, as we assume here, resulted in under-representation." This suggestion however, has no support in anything said herein. It is simply imagined and only draws attention away from the actual finding of this opinion, which is plainly stated in its very first line. The central point is that no reliability determination has been made regarding the ACS data presented by Williams. By not addressing this evidence, the majority creates new law and employs an unconstitutionally truncated analysis in which any evidence other than the Decennial Census is automatically deemed irrelevant. That is not the law because, especially in cases where life and death are on the line, it is fundamentally unfair.[3]

---

[3] Likewise, the majority selectively applies *Partida* to suit its reasoning. Certainly, *Partida* pointed to the Decennial Census as a reliable source of information, as does this dissent. It does not, however, in any shape, form, or fashion support the truncated procedure espoused by the majority. In fact, it warns against such an inflexible and incomplete analysis.

The trial court did not consider the reliability of Williams' ACS data in this matter. As such, the trial court's order should be vacated and this case remanded to the trial court for a determination as to the reliability of this evidence and its impact, if any, on Williams' claims.

DECIDED JUNE 28, 2010 —
RECONSIDERATION DENIED JULY 27, 2010.

*Christian G. Lamar, Gladys H. Pollard,* for appellant.
*Tracy Graham-Lawson, District Attorney, Erman J. Tanjuatco, Lalaine A. Briones, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Patricia Attaway Burton, Senior Assistant Attorney General,* for appellee.